# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

FILED

MAY 17 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

In the Matter of the Search of

Dell Laptop Computer, S/N: 6R1KKR1; Apple Macbook,
S/N: C02LN5Z5FD57; HP Laptop Computer, S/N:
CND9202G7D; Compaq Laptop Computer, S/N:
CNF7011BXH; Dell Desktop Computer, S/N: 8H9PHS1;
Gateway Desktop Computer, CAG5361002558; Dell Desktop
Computer, S/N: CZLC461; 26 video cassettes, Sony NP-F330
video camera, 26 video cassettes Sony NP-F330 video camera
CURRENTLY LOCATED AT FBI Sacramento, 2001
Freedom Way, Roseville, CA, 95678

)
)
)
)
)
)
)
)
)

Case No.

2 : 1 8 - SW 4 3 6    AC

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

## SEE ATTACHMENT A, attached hereto and incorporated by reference.

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

## SEE ATTACHMENT B, attached hereto and incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

◆ evidence of a crime;

◆ contraband, fruits of crime, or other items illegally possessed;

◆ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251; | Production and Transportation of Child Pornography; |
| 18 U.S.C. §§ 2252, 2252A; | Possession, Receipt, and Distribution of Child Pornography; |
| 18 U.S.C. § 2422(b); and | Enticement of a Minor; |
| 18 U.S.C. §§ 2423(a) and (b) | Transportation of Minors for Sexual Exploitation |

The application is based on these facts:

## SEE AFFIDAVIT, attached hereto and incorporated by reference.

☐ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Scott A. H. Schofield
Special Agent, Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  5/17/18

_____
*Judge's signature*

City and state:  Sacramento, California        Allison Claire, U.S. Magistrate Judge

McGREGOR W. SCOTT
United States Attorney
JILL THOMAS
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of:<br><br>Dell Laptop Computer, S/N: 6R1KKR1; Apple Macbook, S/N: C02LN5Z5FD57; HP Laptop Computer, S/N: CND9202G7D; Compaq Laptop Computer, S/N: CNF7011BXH; Dell Desktop Computer, S/N: 8H9PHS1; Gateway Desktop Computer, CAG5361002558; Dell Desktop Computer, S/N: CZLC461; 26 video cassettes, Sony NP-F330 video camera, CURRENTLY LOCATED AT FBI Sacramento, 2001 Freedom Way, Roseville, CA, 95678 | CASE NO.<br><br>AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH DEVICES |

1.      I, Scott A. H. Schofield, being first duly sworn, hereby depose and state as follows:

## I.   **INTRODUCTION AND AGENT BACKGROUND**

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices— which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

3.      I have been employed as an FBI Special Agent since 2004, and am currently assigned to the Violent Crimes Against Children Squad in the Sacramento Division.  While employed by the FBI, I have investigated federal criminal violations related to high technology or cybercrime, child

1   exploitation, and child pornography.  I have received training in the area of identifying and investigating

2   child pornography and child exploitation crimes, and as part of my duties have observed and reviewed

3   numerous examples of child pornography in all forms of media, including computer media.  In the

4   course of my employment, I have participated in many search warrants in connection with child

5   exploitation matters and other violations involving businesses and residences.  Moreover, I am a federal

6   law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251,

7   2252, 2252A, 2422(b), and 2423(a) and (b), and I am authorized by the Attorney General to request a

8   search warrant.

9       4.      This affidavit is intended to show only that there is sufficient probable cause for the

10  requested warrant and does not set forth all of my knowledge about this matter.

11          **II.      IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

12      5.      The property to be searched is as follows:

13          a)      Dell Laptop Computer, S/N: 6R1KKR1;

14          b)      Apple Macbook, S/N: C02LN5Z5FD57;

15          c)      HP Laptop Computer, S/N: CND9202G7D;

16          d)      Compaq Laptop Computer, S/N: CNF7011BXH;

17          e)      Dell Desktop Computer, S/N: 8H9PHS1;

18          f)      Gateway Desktop Computer, CAG5361002558;

19          g)      Dell Desktop Computer, S/N: CZLC461

20          h)      26 video cassettes, Sony NP-F330 video camera

21      6.      These devices shall hereinafter be referred to as the "SUBJECT DEVICES."  The

22  SUBJECT DEVICES are currently located at FBI Sacramento Headquarters, 2001 Freedom Way,

23  Roseville, California, 95678.

24      7.      The applied-for warrant would authorize the forensic review of the SUBJECT DEVICES

25  for the purpose of identifying electronically stored data particularly described in Attachment B.

26          **III.      PROBABLE CAUSE**

27      8.      The following investigation was related to me by El Dorado County Sheriff's Detectives

28  via their written reports and other investigative documents and through interview(s):

Victim #1 – Natalie Guzman – born in 1977

9.      In 2004, Natalie Guzman (then known as Natalie Willette) reported to the El Dorado County Sheriff's Office (EDSO) that she had been molested by her step-father, KEITH WILLETTE, from the age of 9 years old until 2004, when Guzman was 26 years old.

10.     Guzman lived in Sacramento County, California when she was 9 years of age.  The molestation began with back and body massages.  Between the ages of 9 and 12 years of age, Guzman was involved in competitive gymnastics and would travel with her step-father, WILLETTE, who was coaching her in gymnastics.  While traveling, WILLETTE would continue the body rubs, including pulling off Guzman's underwear and rubbing her vagina.  WILLETTE would masturbate while he did this and ejaculate onto Guzman.

11.     Between the ages of 11 and 12 years, Guzman lived with her family in Minnesota.  During this time, WILLETTE would take Guzman into the back yard and talk to her about having sexual intercourse with him.  WILLETTE told Guzman that he was in love with her and wanted to be with her forever.

12.     At the age of 12, WILLETTE began having regular sexual intercourse with Guzman.  This normally occurred in the middle of the night.  One time, Guzman's mother (WILLETTE's wife) walked in while this was happening.  WILLETTE told his wife he was having trouble sleeping and decided to sleep in Guzman's bed.  Guzman's mother left the room and WILLETTE continued to have sexual intercourse with Guzman.

13.     Over the next 14 years, WILLETTE continued to have sexual intercourse with Guzman.  This occurred in multiple states as the WILLETTE family moved around from gymnastics coaching job to gymnastic coaching job.

14.     Guzman recalled WILLETTE recording their sexual intercourse.  One such time occurred with Guzman was when Guzman was 16 years old.  Guzman estimated that the video was about an hour long.  Guzman later walked in on WILLETTE in his bedroom masturbating while watching the video.

15.     Guzman also recalled a time when WILLETTE took photographs of Guzman with a Polaroid camera.  She was approximately 17 years of age at the time.  As background, WILLETTE had a photography business for many years, and GUZMAN believed it was still running.  It was called

1    KILA PARKS PHOTOGRAPHY.  In the days before digital photography, WILLETTE would develop

2    photos by mail or taking them to photo developing locations.  Once digital photography came about, he

3    would print his own photos.  Most of the photos were modeling style photos.

4    　　　　16.    Between the ages of 15 and 16, Guzman became pregnant by WILLETTE.  WILLETTE

5    forced her to tell a story that she had been sexually active with a boy from her high school and use that

6    story to get an abortion.

7    　　　　17.    At one point, WILLETTE was angry with Guzman and forced her to sleep in his bed with

8    him and WILLETTE's mother.  During this period, WILLETTE had sex with Guzman and her mother.

9    Guzman and her mother did not touch each other, but WILLETTE had sexual contact with both of them

10   during this encounter.

11   　　　　18.    At approximately 21 years of age, Guzman became pregnant again, this time by a

12   boyfriend.  She had a daughter and WILLETTE had thought at one point that he was the girl's father.

13   　　　　19.    At the age of 26 years old, Guzman ran away from WILLETTE with her daughter.

14   Shortly thereafter, she reported the sexual contact with WILLETTE to the EDSO, who conducted a

15   follow-up investigation.  As part of this investigation, EDSO interviewed WILLETTE who admitted to

16   the sexual relationship with Guzman from "a very early age."  WILLETTE's wife, Terry, was also

17   interviewed and admitted to knowledge of her husband's sexual relationship with her daughter.  Terry

18   admitted to having seen the video and photographs and described them similarly as Guzman had

19   described them. Terry stated that Guzman had confronted Keith a few days back after talking with her

20   therapists.  After that conversation, Keith put the photographs and video tapes into the fireplace and

21   burned them.  Ultimately, EDSO determined there was a lack of nexus/jurisdiction/venue to El Dorado

22   County, California, and referred the case to Sacramento County and three other counties in other states

23   where the alleged abuse also occurred.

24   　　　　20.    None of these counties conducted an investigation and no charges were filed.

25   WILLETTE and his wife had been arrested by EDSO in the wake of Guzman's complaint to that

26   agency.  After referring the case to other jurisdictions, EDSO released WILLETTE and his wife.

27   ///

28   ///

Victim #2 – Melissa Genovese, born in 1984

21.     On May 18, 2017, the EDSO received a call regarding allegations of molestation of a different minor female between 1999 and 2004.  EDSO deputies contacted the victim, Melissa Genovese, 33 years of age at the time of the report.  Genovese stated she had been in therapy and was ready to speak about the molestation which had occurred at the hand of her gymnastics coach. Genovese identified WILLETTE as the subject of her complaint.

22.     In 1999, when Genovese was 14 years of age, she was enrolled in gymnastics at All Star Gymnastics in Diamond Springs, California.  Her coach was WILLETTE, who was approximately 40 years old at that time.  Approximately a year after WILLETTE began coaching Genovese, she injured her left hamstring.  WILLETTE offered to massage her injury.  Genovese estimated that WILLETTE would continue to give her massages until she was 19 years old.

23.     Initially, WILLETTE massaged Genovese's hamstring.  However, as time went on, WILLETTE started massaging her under her leotard, touching her bare buttock.  WILLETTE eventually started giving Genovese full body massages.  He told her to remove all of her clothing so that they would not get in the way.  When WILLETTE performed the massages, he touched her bare buttocks and breasts.  On occasion, he also touched the outer portions of her vagina underneath her clothing. WILLETTE ensured Genovese came to training in the morning when no one else was at the gym for private lessons.  The training sessions occurred between 0900 hours and 1200 hours.  The massages usually took place near the end of the morning training sessions.

24.     Genovese found it to be odd that she had to take her clothing off for the massages, and on a few occasions, questioned WILLETTE's actions.  Every time she questioned him, he told her that in order for her to make the Olympics, she had to do what he said.  During many of the massages, WILLETTE he laid top of Genovese while she was naked.  She felt an erection through his clothing on her back.  The first time this occurred, Genovese was approximately 16 years old.  Genovese thought on a few occasions that the massages were filmed.  These encounters with WILLETTE continued until 2005, when Genovese turned 19 years old.

25.     WILLETTE also told Genovese that, in order to track her progress, he needed to take measurements of her body.  He maintained a binder of her progress.  The method in which WILLETTE

1   measured Genovese required her to be completely naked.  He pinched her arms, body, breasts, and

2   vagina.  He used a measuring tape to measure her nipples.  He told her that measuring her nipples would

3   help determine how large her breasts were going to grow.  He used the measuring tape to measure the

4   labia of her vagina.  He also pinched her labia during the measurement sessions.

5        26.     When Genovese was about 16 years old, WILLETTE said he would track Genovese's

6   progress by photographing her.  He told her to remove her clothing so she was completely naked.

7   WILLETTE would instruct Genovese to bend over his desk while he stood behind her taking pictures of

8   her buttocks and vaginal area.  WILLETTE told GENOVESE to flex her hamstrings and he would take

9   close up pictures.  WILLETTE explained to Genovese that he needed to take these pictures to show her

10  muscle development.

11       27.     Genovese asked him to delete the photographs, and WILLETTE became upset.  He

12  "acted like a two year old" and threw a fit.  At one point, WILLETTE told Genovese he deleted the

13  photographs because he was scared someone may see them.  Genovese was not certain the photographs

14  were deleted because her friend Natalie (WILLETTE's step daughter) told Genovese that she saw some

15  photos of Genovese naked.  Genovese was certain the photos were in the same binder as the

16  measurements.  Genovese believed she was around 16 years old in these photographs.

17       28.     Over the course of several years, WILLETTE became close friends with Genovese's

18  family while he was her gymnastics coach.  On occasion, he went to the Genovese's house to hang out

19  and use the swimming pool and Jacuzzi.  On one of the occasions, WILLETTE went to the Genovese

20  house and only Melissa Genovese and WILLETTE were in the Jacuzzi together while Genovese's

21  parents were in the house.  The Jacuzzi was outside the view of her parents.

22       29.     While in the Jacuzzi, WILLETTE took off Genovese's bathing suit bottoms and exposed

23  her genital area.  He instructed her to perform the "splits."  The Jacuzzi's circumference was small

24  enough that she could place one foot against opposite walls.  When she did this, her legs were

25  completely separated.  WILLETTE told Genovese he was going to teach her about her vagina.  With his

26  fingers, WILLETTE touched Genovese's vagina.  He digitally stimulated Genovese's clitoris in an

27  effort to arouse her.  WILLETTE told Genovese to touch his shorts because they were full of air.  When

28  she did so, she felt his erect penis.  Genovese recalled a similar occurrence happening one other time

1   when she was about 16 years old.  These experiences were very traumatic for Genovese.

2       30.   Genovese recalled that the last time WILLETTE gave her a massage was the winter

3   before her 20th birthday.  Genovese left for college soon after this.

4       31.   Genovese felt manipulated by WILLETTE.  Every time she questioned his actions, he

5   explained that this was necessary for her to prepare for the Olympics.  In addition, WILLETTE told

6   Genovese on numerous occasions that he had been a Green Beret and could kill her with one finger.

7   WILLETTE said he could manipulate pressure points on Genovese's neck to put her to sleep or kill her.

8   WILLETTE was larger than Genovese and she believed that he could hurt her.  Genovese realized the

9   manipulation afterward, when she went away to college.

10      32.   EDSO continued their 2017 investigation based upon Genovese's information and, as

11  part of that investigation, obtained a search warrant for evidence of the sexual contact between

12  WILLETTE and Genovese, including digital evidence.  Pursuant to that warrant, EDSO seized the

13  SUBJECT DEVICES from WILLETTE's residence in Cameron Park, California.  The devices were in

14  the custody of EDSO until March 13, 2018 when they were transferred to FBI custody.

15      33.   I know through my training and experience that people with a sexual interest in children

16  sometimes take pictures or videos of their sexual contact with children, as happened in this case.  In my

17  experience, people who capture such photographs and/or videos seldom part with them, and often keep

18  backups of the photographs and/or videos in a secure place, such as a safe or password-protected

19  computer.  Many such people use these sexually explicit images to relive the sexual encounters, as

20  happened in this case when WILLETTE watched the video of him and Guzman and masturbated to the

21  video.

22      34.   Between 2004 and 2017, technology has advanced.  I know that video tapes can be

23  digitized and any photographs and/or videos that WILLETTE had from that time frame could have been

24  converted to a digital format and could be located on any electronic device, including the types of

25  devices seized in this case.  As additional employment, WILLETTE had worked as a photographer for

26  several years and, based on information gathered in this investigation, has some expertise based on his

27  photography business.  Based on this information, I am requesting a search warrant for the SUBJECT

28  DEVICES described in Attachment A to seek evidence of the crimes detailed in above in regards to the

1  two victims named above, or any other minors, as detailed in Attachment B.  Based on my experience,

2  video cassettes come in various sizes, but all work in essentially the same way.  Each cassette contains a

3  length of magnetic tape that hold information when manipulated magnetically.  The difference in the

4  types of cassettes is generally the size and form factor, and the type of equipment needed to record

5  information to it or access information already on the cassette.  I have personally taken a video cassette

6  and transferred the information to a computer in a digital format for storage on that computer's hard disk

7  drive, and thus know that this type of conversion is possible.

8  ## IV.      TECHNICAL TERMS

9       35.      Based on my training and experience, I use the following technical terms to convey the

10  following meanings:

11       a)      Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

12  telephone) is a handheld wireless device used for voice and data communication through radio signals.

13  These telephones send signals through networks of transmitter/receivers, enabling communication with

14  other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a

15  "call log," which records the telephone number, date, and time of calls made to and from the phone.  In

16  addition to enabling voice communications, wireless telephones offer a broad range of capabilities.

17  These capabilities include: storing names and phone numbers in electronic "address books;" sending,

18  receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs

19  and moving video; storing and playing back audio files; storing dates, appointments, and other

20  information on personal calendars; and accessing and downloading information from the Internet.

21  Wireless telephones may also include global positioning system ("GPS") technology for determining the

22  location of the device.

23       b)      Digital camera:  A digital camera is a camera that records pictures as digital

24  picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and

25  removable storage media to store their recorded images.  Images can usually be retrieved by connecting

26  the camera to a computer or by connecting the removable storage medium to a separate reader.

27  Removable storage media include various types of flash memory cards or miniature hard drives.  Most

28  digital cameras also include a screen for viewing the stored images.  This storage media can contain any

1   digital data, including data unrelated to photographs or videos.

2           c)     Portable media player:  A portable media player (or "MP3 Player" or iPod) is a

3   handheld digital storage device designed primarily to store and play audio, video, or photographic files.

4   However, a portable media player can also store other digital data.  Some portable media players can use

5   removable storage media.  Removable storage media include various types of flash memory cards or

6   miniature hard drives.  This removable storage media can also store any digital data.  Depending on the

7   model, a portable media player may have the ability to store very large amounts of electronic data and

8   may offer additional features such as a calendar, contact list, clock, or games.

9           d)     GPS:  A GPS navigation device uses the Global Positioning System to display its

10  current location.  It often contains records the locations where it has been.  Some GPS navigation

11  devices can give a user driving or walking directions to another location.  These devices can contain

12  records of the addresses or locations involved in such navigation.  The Global Positioning System

13  (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

14  contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical

15  representation of the current time, combined with a special sequence of numbers.  These signals are sent

16  by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those

17  signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that

18  antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a

19  high level of precision.

20          e)     PDA:  A personal digital assistant, or PDA, is a handheld electronic device used

21  for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.

22  Some PDAs also function as wireless communication devices and are used to access the Internet and

23  send and receive e-mail.  PDAs usually include a memory card or other removable storage media for

24  storing data and a keyboard and/or touch screen for entering data.  Removable storage media include

25  various types of flash memory cards or miniature hard drives.  This removable storage media can store

26  any digital data.  Most PDAs run computer software, giving them many of the same capabilities as

27  personal computers.  For example, PDA users can work with word-processing documents, spreadsheets,

28  and presentations.  PDAs may also include global positioning system ("GPS") technology for

1   determining the location of the device.

2       f)      IP Address: An Internet Protocol address (or simply "IP address") is a unique

3   numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in

4   the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet

5   computer must be assigned an IP address so that Internet traffic sent from and directed to that computer

6   may be directed properly from its source to its destination.  Most Internet service providers control a

7   range of IP addresses.  Some computers have static-that is, long-term-IP addresses, while other

8   computers have dynamic-that is, frequently changed-IP addresses.

9       g)      Internet: The Internet is a global network of computers and other electronic

10  devices that communicate with each other.  Due to the structure of the Internet, connections between

11  devices on the Internet often cross state and international borders, even when the devices

12  communicating with each other are in the same state.

13          **V.       ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

14      36.     Based on my knowledge, training, and experience, I know that electronic devices can

15  store information for long periods of time.  Similarly, things that have been viewed via the Internet are

16  typically stored for some period of time on the device.  This information can sometimes be recovered

17  with forensics tools.

18      37.     There is probable cause to believe that things that were once stored on any of the

19  SUBJECT DEVICES may still be stored there, for at least the following reasons:

20      a)      Based on my knowledge, training, and experience, I know that computer files or

21  remnants of such files can be recovered months or even years after they have been downloaded onto a

22  storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium

23  can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered

24  months or years later using forensic tools.  This is so because when a person "deletes" a file on a

25  computer, the data contained in the file does not actually disappear; rather, that data remains on the

26  storage medium until it is overwritten by new data.

27      b)      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack

28  space-that is, in space on the storage medium that is not currently being used by an active file-for long

1  periods of time before they are overwritten.  In addition, a computer's operating system may also keep a

2  record of deleted data in a "swap" or "recovery" file.

3        c)      Wholly apart from user-generated files, mobile device and computer storage media often

4  contain electronic evidence of how a computer has been used, what it has been used for, and who has

5  used it.  To give a few examples, this forensic evidence can take the form of operating system

6  configurations, artifacts from operating system or application operation, file system data structures, and

7  virtual memory "swap" or paging files.  Mobile device and computer users typically do not erase or

8  delete this evidence, because special software is typically required for that task.  However, it is

9  technically possible to delete this information.

10       d)      Similarly, files that have been viewed via the Internet are sometimes automatically

11 downloaded into a temporary Internet directory or "cache."

12       38.     <u>Forensic evidence.</u>  As further described in Attachment B, this application seeks

13 permission to locate not only electronically stored information that might serve as direct evidence of the

14 crimes described on the warrant, but also forensic evidence that establishes how the DEVICES were

15 used, the purpose of their use, who used them, and when.  There is probable cause to believe that this

16 forensic electronic evidence might be on the DEVICES because:

17       a)      Data on the storage medium can provide evidence of a file that was once on the storage

18 medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that

19 has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store

20 configuration information on the storage medium that can reveal information such as online nicknames

21 and passwords.  Operating systems can record additional information, such as the attachment of

22 peripherals, the attachment of USB flash storage devices or other external storage media, and the times

23 the device was in use. Device file systems can record information about the dates files were created and

24 the sequence in which they were created.

25       b)      Forensic evidence on a device can also indicate who has used or controlled the device.

26 This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a

27 search warrant at a residence.

28       c)      A person with appropriate familiarity with how an electronic device works may, after

1  examining this forensic evidence in its proper context, be able to draw conclusions about how electronic

2  devices were used, the purpose of their use, who used them, and when.

3       d)     The process of identifying the exact electronically stored information on a storage

4  medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is

5  not always data that can be merely reviewed by a review team and passed along to investigators.

6  Whether data stored on a computer is evidence may depend on other information stored on the computer

7  and the application of knowledge about how a computer behaves.  Therefore, contextual information

8  necessary to understand other evidence also falls within the scope of the warrant.

9       e)     Further, in finding evidence of how a device was used, the purpose of its use, who used

10  it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage

11  medium.

12       39.    <u>Nature of examination.</u>  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the

13  warrant I am applying for would permit the examination of the device consistent with the warrant.  The

14  examination may require authorities to employ techniques, including but not limited to computer-

15  assisted scans of the entire medium, that might expose many parts of the device to human inspection in

16  order to determine whether it is evidence described by the warrant.

17       40.    <u>Manner of execution.</u>  Because this warrant seeks only permission to examine a device

18  already in law enforcement's possession, the execution of this warrant does not involve the physical

19  intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize

20  execution of the warrant at any time in the day or night.

21       41.    I anticipate that the FBI may obtain forensics assistance from the Department of Justice,

22  High Tech Investigative Unit (a specialized computer examination unit evaluating electronic media and

23  devices in child exploitation cases) and request authority for FBI and/or HTIU personnel or its designees

24  to complete the forensic review of these items.

25                 **VI.**    <u>**CONCLUSION**</u>

26       42.    The SUBJECT DEVICES are currently in the lawful possession of the Sacramento FBI.

27  As stated above, the SUBJECT DEVICES were seized pursuant to a search warrant executed by the El

28  Dorado County Sheriff's Office.  Therefore, while the Sacramento FBI might already have all necessary

1  authority to examine the DEVICES, I seek this additional warrant out of an abundance of caution to be

2  certain that an examination of the DEVICES will comply with the Fourth Amendment and other

3  applicable laws.

4       43.     I submit that this affidavit supports probable cause for a search warrant authorizing the

5  examination of the SUBJECT DEVICES described in Attachment A to seek the items described in

6  Attachment B.

Respectfully submitted,

Scott A. H. Schofield
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on:  5/17/18

The Honorable Allison Claire
UNITED STATES MAGISTRATE JUDGE

5/15/18

Approved as to form by AUSA JILL THOMAS

AFFIDAVIT                              13

## ATTACHMENT A

The property to be searched are:  Dell Laptop Computer, S/N: 6R1KKR1; Apple Macbook, S/N: C02LN5Z5FD57; HP Laptop Computer, S/N: CND9202G7D; Compaq Laptop Computer, S/N: CNF7011BXH; Dell Desktop Computer, S/N: 8H9PHS1; Gateway Desktop Computer, CAG5361002558; Dell Desktop Computer, S/N: CZLC461; 26 video cassettes, Sony NP-F330 video camera, 26 video cassettes Sony NP-F330 video camera, currently located at FBI Sacramento, 2001 Freedom Way, Roseville, CA, 95678.

This warrant authorizes the forensic examination of the SUBJECT DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the SUBJECT DEVICES described in Attachment A that relate to violations of  18 U.S.C. §§ 2251, 2252, 2252A, 2422(b), and 2423(a) and (b), including:

      a.      Any communications with minors or communications with adults regarding minors;

      b.      Any information pertaining to any individual's sexual interest in minors;

      c.      Any items, images, documents, communications, records, and information pertaining to the sexually explicit communications with a minor(s) or adult(s) in relation to minors that affected or were transmitted or received via computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail.

      d.      Any information about, or communications with Natalie Guzman (formerly Willette) or Melissa Genovese.

      e.      Any evidence of travel with any minors.

      f.      Evidence of who used, owned, or controlled the DEVICES at the time the items described in this warrant were created, edited, viewed, or deleted, such as logs, registry entries, saved user names and passwords, documents, and browsing history, to include bookmarked sites;

      g.      Evidence of malicious software ("malware");

      h.      Evidence of the lack of such malicious software;

      i.      Evidence of attachment to a computer or storage devices, thumb drives, SD Cards, or similar media; evidence of conversion from video cassette tapes to digital media;

      j.      Evidence of the times each DEVICE was used;

      k.      Passwords, encryption keys, and other access devices that may be necessary to access each DEVICE;

      l.      Evidence identifying the location from which any sexually explicit communications were held, including date and time of such communications;

      m.      Any and all photos or videos that may have been sent or received as part of a text or e-mail conversation in any application of program within the DEVICES relating to sexual interest in minors, to include date and time of the receipt or send of such files;

      n.      Evidence identifying whether communications were deleted, to include date and time of deletion;

o.    Records of Internet Protocol addresses used and WiFi networks accessed;

p.    Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address;

q.    Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br>Dell Laptop Computer, S/N: 6R1KKR1; Apple Macbook, S/N:<br>C02LN5Z5FD57; HP Laptop Computer, S/N: CND9202G7D;<br>Compaq Laptop Computer, S/N: CNF7011BXH; Dell Desktop<br>Computer, S/N: 8H9PHS1; Gateway Desktop Computer,<br>CAG5361002558; Dell Desktop Computer, S/N: CZLC461; 26<br>video cassettes, Sony NP-F330 video camera, 26 video cassettes<br>Sony NP-F330 video camera CURRENTLY LOCATED AT<br>FBI Sacramento, 2001 Freedom Way, Roseville, CA, 95678 | Case No.<br><br>2: 1 8 - SW 4 3 6   AC |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ 5/31/18 _____ *(not to exceed 14 days)*
✓ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____ 5/17/18   1:30 p _____                _____
                                                                                    *Judge's signature*

City and state:     Sacramento, California                        Allison Claire, U.S. Magistrate Judge
                                                                                    *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____

| Signature of Judge | Date |

## ATTACHMENT A

The property to be searched are: Dell Laptop Computer, S/N: 6R1KKR1; Apple Macbook, S/N: C02LN5Z5FD57; HP Laptop Computer, S/N: CND9202G7D; Compaq Laptop Computer, S/N: CNF7011BXH; Dell Desktop Computer, S/N: 8H9PHS1; Gateway Desktop Computer, CAG5361002558; Dell Desktop Computer, S/N: CZLC461; 26 video cassettes, Sony NP-F330 video camera, 26 video cassettes Sony NP-F330 video camera, currently located at FBI Sacramento, 2001 Freedom Way, Roseville, CA, 95678.

This warrant authorizes the forensic examination of the SUBJECT DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.     All records on the SUBJECT DEVICES described in Attachment A that relate to violations of 18 U.S.C. §§ 2251, 2252, 2252A, 2422(b), and 2423(a) and (b), including:

a.     Any communications with minors or communications with adults regarding minors;

b.     Any information pertaining to any individual's sexual interest in minors;

c.     Any items, images, documents, communications, records, and information pertaining to the sexually explicit communications with a minor(s) or adult(s) in relation to minors that affected or were transmitted or received via computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail.

d.     Any information about, or communications with Natalie Guzman (formerly Willette) or Melissa Genovese.

e.     Any evidence of travel with any minors.

f.     Evidence of who used, owned, or controlled the DEVICES at the time the items described in this warrant were created, edited, viewed, or deleted, such as logs, registry entries, saved user names and passwords, documents, and browsing history, to include bookmarked sites;

g.     Evidence of malicious software ("malware");

h.     Evidence of the lack of such malicious software;

i.     Evidence of attachment to a computer or storage devices, thumb drives, SD Cards, or similar media; evidence of conversion from video cassette tapes to digital media;

j.     Evidence of the times each DEVICE was used;

k.     Passwords, encryption keys, and other access devices that may be necessary to access each DEVICE;

l.     Evidence identifying the location from which any sexually explicit communications were held, including date and time of such communications;

m.     Any and all photos or videos that may have been sent or received as part of a text or e-mail conversation in any application of program within the DEVICES relating to sexual interest in minors, to include date and time of the receipt or send of such files;

n.     Evidence identifying whether communications were deleted, to include date and time of deletion;

o.      Records of Internet Protocol addresses used and WiFi networks accessed;

p.      Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address;

q.      Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.